**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GLOBALTAP LLC,             ) | |
|                           ) | |
|         Plaintiff,     ) | |

GLOBALTAP LLC,

        Plaintiff,

      v.

SMART TAP LLC, MEDIA
VENTURES GROUP LLC and
WILLIAM APFELBAUM,

        Defendants.
_____

SMART TAP, LLC,

        Counterplaintiff and
        Third-Party Plaintiff,

      v.

GLOBALTAP LLC,

        Counterdefendant,

        and

DANIEL WHITMAN,

        Third-Party Defendant.

No. 13 C 5322

Judge Rebecca R. Pallmeyer

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff GlobalTap, LLC developed a concept and design for outdoor water-bottle filling stations and obtained a design patent for its product: the '348 patent. GlobalTap brought this action against SmartTap, LLC, its competitor, alleging that SmartTap stole GlobalTap's concept and design to launch its own outdoor bottle filling business. In its complaint, GlobalTap alleged that SmartTap breached a confidentiality agreement between the parties, infringed on GlobalTap's patent, and misappropriated GlobalTap's trade secrets. While this litigation was pending, SmartTap went out of business, purportedly as a direct result of GlobalTap's lawsuit. According to SmartTap, GlobalTap had no basis for the allegations in its complaint, but its

founder, Daniel Whitman, nonetheless repeated those allegations to potential SmartTap customers and purposefully prolonged these proceedings in order to interfere with SmartTap's business relationships and drive SmartTap out of the market for outdoor bottle fillers.

SmartTap filed a counterclaim against GlobalTap and a third-party complaint against Daniel Whitman alleging several antitrust violations, including fraudulent procurement of the '348 patent (Count I), bad faith enforcement of the patent (Count II), predatory sham litigation (Count III), and conspiracy to monopolize (Count IV). SmartTap also brings a state-law claim of tortious interference with its prospective economic advantage (Count V). Global Tap and Mr. Whitman now move to dismiss SmartTap's counterclaim [138] and third party complaint [140] urging that SmartTap fails to state a claim for which relief can be granted. For the reasons stated below, the motions are granted with respect to Counts I, II, III, and IV, and denied with respect to Count V.

## BACKGROUND

SmartTap is a New York Limited Liability Company, which was incorporated January 29, 2013 with the name Max Hydration LLC.[1] (SmartTap's Counterclaim and Third Party Complaint [114], hereinafter "Counterclaim," ¶ 4.) SmartTap was created by Defendants William Apfelbaum[2] and Media Ventures Group (MVG).[3] (GlobalTap's Second Amended Complaint [34], hereinafter "2AC," ¶ 33.) MVG is a Delaware Limited Liability Company. (2AC ¶ 4.)

---

[1]     SmartTap changed its name from Max Hydration to SmartTap on May 10, 2013. (Counterclaim ¶ 4.)

[2]     Apfelbaum has been dismissed from this lawsuit for lack of personal jurisdiction. (*See* 5/22/2014 Order [107]) ("[T]he court concludes GlobalTap's allegations are insufficient to establish personal jurisdiction over the individual Defendant, William Apfelbaum. Claims against Defendant William M. Apfelbaum are dismissed without prejudice.")

[3]     The parties have identified Apfelbaum as the founder and owner of SmartTap, but have not identified any other members. Apfelbaum is a resident of Connecticut and also has a residence in California. (2AC ¶ 5.) GlobalTap's sole member is Daniel Whitman, a Michigan resident. The parties assert that there is complete diversity between the parties (2AC ¶ 6; Counterclaim ¶ 7), but have not identified any members of MVG or Max Hydration. The court presumes there is diversity jurisdiction, but expects the parties promptly to confirm this.

William Apfelbaum is the owner of both MVG and SmartTap. (2AC ¶ 5.) GlobalTap is a Michigan Limited Liability Company which was created and founded by Daniel Whitman, a Michigan resident. (Counterclaim ¶¶ 5–6.)

According to GlobalTap, it successfully began its business in 2009 by placing a prototype of its product in a public location in San Francisco. (2AC ¶ 15.) The launch resulted in extensive publicity, and eventually GlobalTap's bottle-filling stations were featured on several YouTube videos, a "Twitter Twicsy" video, and an HBO Documentary. (2AC ¶¶ 16–18, 20.) As a result of the publicity, GlobalTap allegedly entered into partnerships with a wide variety of entities including: Nike, Hurley, and the Rob Machado Foundation's Hydration Nation. (2AC ¶ 20.) GlobalTap also installed bottle filling stations in Aspen, Colorado; Washington, DC; the San Francisco Airport; and at the Oracle Open World, the U.S. Open, the Academy of Sciences (GlobalTap does not specify in what city), and in many schools. (2AC ¶ 21.) After seeing GlobalTap's positive press, Apfelbaum, acting on behalf of Media Ventures Group, reached out to Whitman in the fall of 2012 to discuss a possible partnership between MVG and GlobalTap. (2AC ¶ 22.) Apfelbaum and Whitman entered into a Confidential Disclosure Agreement on November 28, 2012 and proceeded to negotiate a partnership between their companies. (2AC ¶ 23.) During those negotiations, Mr. Whitman shared GlobalTap's Program Summary and Discussion Document, a detailed 101-page Business Plan, and other technical, sales, and pricing information. (2AC ¶¶ 14, 26–28.) According to GlobalTap, MVG promised to provide GlobalTap with a $200,000 loan to be repaid at 8% interest within 18 months. (2AC ¶ 27.) In exchange for the loan, MVG received the exclusive right to use GlobalTap's "GT2000" design and agreed that GlobalTap would serve as MVG's exclusive supplier. (2AC ¶ 27.)

After reaching this agreement, GlobalTap contends that Apfelbaum proceeded to digitally render GlobalTap's design and used it to help develop his own business relationships with GlobalTap's contacts, including contacts in several cities that GlobalTap was already "working with." (2AC ¶¶ 29–32.) Then, in January 2013, Apfelbaum, acting on behalf of MVG,

ended MVG's partnership with GlobalTap and launched SmartTap.  (2AC ¶¶ 33–35.)  GlobalTap identifies several pieces of confidential information that SmartTap allegedly took from the parties' confidential conversations, including the name "SmartTap," the concept of a sponsorship platform with rewards, the same "technology platform" that GlobalTap had disclosed to Apfelbaum in its business plan, GlobalTap's list of corporate sponsors, and GlobalTap's GT2000 design.  (2AC ¶¶ 36–43.)  SmartTap further infringed on GlobalTap's business, GlobalTap contends, by entering into an agreement with GlobalTap's previous business partner, Elkay Manufacturing, to manufacture SmartTap's outdoor bottle filling stations.  (2AC ¶ 44.)

After the partnership with MVG ended, GlobalTap brought this action on July 26, 2013 against SmartTap, MVG, and Mr. Apfelbaum, who was later dismissed for lack of personal jurisdiction.  (See 5/22/2014 Order [107].)  GlobalTap also brought a related action against Elkay, alleging patent infringement, trade secret misappropriation, breach of a confidentiality agreement, breach of a distribution agreement, fraud, and unfair competition.[4]  (See GlobalTap v. Elkay Mfg., No. 13-cv-1632.)  In its first complaint in this case, GlobalTap alleged infringement of its '348 design patent, trade secret misappropriation, breach of the Confidential Disclosure Agreement, fraud, and trade dress infringement.  (Compl. [1] ¶ 1.)  GlobalTap later agreed to dismissal of its patent claim, and that claim was dismissed with prejudice on September 11, 2013.  (See Minute Entry 9/11/2013 [26].)  Later that month, GlobalTap filed a Second Amended Complaint alleging trade secret misappropriation (Count I), breach of the Confidential Disclosure Agreement (Count II), fraud (Count III), and trade dress infringement

---

[4]        This court granted Elkay's motion to dismiss GlobalTap's claims for fraud and unfair competition and GlobalTap later stipulated to dismissal of the patent infringement claim with prejudice.  (See Memorandum Opinion and Order, GlobalTap v. Elkay Mfg., No. 13-cv-1632 [112], 9.)  After completing discovery, Elkay moved for summary judgment, which the court granted in part and denied in part.  Several of GlobalTa'p's claims survived, including its claim for misappropriation of trade secrets with respect to the "concept of an outdoor water bottle filler," and its claims for breach of the confidentiality agreement and certain provisions of the distribution agreement.  (Id. at 27.)

(Count IV).  (2AC.)  This court dismissed the fraud allegations (Count III) on March 4, 2014 as insufficient (Minute Entry 3/4/2014 [94]), and on April 10, 2014, this court dismissed the breach of contract claim against SmartTap because SmartTap was not a party to the Confidential Disclosure Agreement signed by MVG and GlobalTap.  (Minute Entry 4/10/2014 [101].) GlobalTap's remaining claims against SmartTap are: Count I (trade secret misappropriation) and Count IV (trade dress infringement).[5]

SmartTap filed counterclaims against GlobalTap and brings a third-party complaint against Mr. Whitman, alleging antitrust harm resulting from this litigation.  In Count I, SmartTap alleges that the '348 patent was fraudulently procured through several intentional omissions during the patent prosecution.  Specifically, SmartTap alleges that Mr. Whitman knowingly failed to disclose: (1) the prior public use of the bottle filling station during the 2009 pilot in San Francisco, (2) information that GlobalTap obtained from Elkay, which constituted prior art, and (3) the fact that Elkay was at least part owner of the information contained in the patent. (Counterclaim ¶¶ 44–46.)  GlobalTap voluntarily dismissed its patent claims in this case and the related case against Elkay and these allegations, therefore, have not been adjudicated; GlobalTap's design patent remains valid.

In Count II, SmartTap contends that GlobalTap's complaint, filed by Mr. Whitman, constituted a bad faith effort to enforce a patent because Whitman knew that the '348 patent had been procured fraudulently.  SmartTap maintains in Count III that GlobalTap's remaining claims are also baseless and that this lawsuit is a sham, designed to drive SmartTap out of business.  In support of this Count, SmartTap notes, first, that Mr. Whitman filed for bankruptcy in 2010, and his interest in GlobalTap transferred to the bankruptcy Trustee at that time, which meant that Mr. Whitman had no authority in 2013 to bring any lawsuit on behalf of GlobalTap.

---

[5]     GlobalTap also maintains three claims against MVG: Count I for trade secret misappropriation, Count II for breach of the Confidential Disclosure Agreement, and Count IV for trade dress infringement.

(Counterclaim ¶¶ 13–14, 17–18.)  Second, SmartTap alleges that GlobalTap, through Whitman, made several willful misrepresentations in the second amended complaint, including: (a) that Whitman himself had developed the "101-page, exhaustive Business Plan" (*see* 2AC ¶ 14); (b) that the Business Plan contained detailed trade secrets (*see* 2AC ¶ 14); (c) that GlobalTap had installed tap stations in 100 schools in 20 cities through a partnership with Home Box Office, Inc. (*see* 2AC ¶ 18); (d) that there were partnerships with Nike, Hurley, and the Hydration Nation (*see* 2AC ¶ 20); and (e) that there was a YouTube video promoting GlobalTap (*see* 2AC ¶ 20). (Counterclaim ¶¶ 20–29.)  SmartTap alleges that Mr. Whitman admitted that these statements were false during a deposition conducted in relation to his bankruptcy proceedings. (Counterclaim ¶¶ 19–20.)  He also admitted that GlobalTap had ceased doing business in 2010 because it wasn't manufacturing or selling fountains.  (Counterclaim ¶ 30.)  SmartTap complains about GlobalTap's litigation delays, including its failure to retain counsel despite explicit court orders to do so, characterizing these delays as purposeful efforts to prolong the litigation and increase SmartTap's expenses.  (2AC ¶¶ 56–82.)  In Count IV, SmartTap alleges that Whitman, GlobalTap, and attorneys at the Cantwell law firm[6] conspired to monopolize the outdoor bottle filling market by bringing sham litigation and prolonging that litigation to drive SmartTap out of business.

Finally, in Count V, SmartTap asserts that Mr. Whitman not only used the sham litigation to drive SmartTap out of business, but also actively interfered with SmartTap's potential customers by repeating the unfounded allegations of patent infringement to potential customers in order to dissuade them from doing business with SmartTap.  (Counterclaim ¶¶ 50–54.)  While this litigation was pending, SmartTap suffered serious financial losses and was, in fact, out of business as of January 15, 2014.  (Counterclaim ¶¶ 74, 79, 126–31.)

---

[6] The Cantwell firm served as personal counsel to Mr. Whitman, before he was a party to this case, but did not enter a formal appearance on his behalf.  The firm did, however, enter an appearance on behalf of GlobalTap in February 2014.  (*See* Attorney Appearance for Plaintiff GlobalTap LLC by Peter A. Cantwell, 2/24/2014 [71].)

## **DISCUSSION**

GlobalTap and Whitman urge the court to dismiss SmartTap's counterclaim and third party complaint for failure to state a claim and failure to plead fraud with particularity. On a motion to dismiss, all of a plaintiff's and counter-plaintiff's allegations are treated as true. FED. R. CIV. P. 12(b)(6); *Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 554–55 (7th Cir. 2012). Complaints and counter-complaints will survive a motion to dismiss if they contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Furthermore, the court "need not accept as true any legal assertions." *Vesely v. Armslist LLC*, 762 F.3d 661, 664–65 (7th Cir. 2014). Allegations of fraud are held to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires the pleader to allege the who, what, where, when, and how of the fraud. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014). Rule 9(b) applies only to allegations of fraud, not to allegations regarding intent, knowledge, or state of mind, which may be averred generally. *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006).

The court concludes that Counts I–IV must be dismissed for failure to state a claim. Counts I and II fail do not allege facts supporting a plausible claim that GlobalTap has a dangerous probability of monopoly power. Counts III and IV do not plead facts that allow SmartTap to overcome the general immunity from antitrust liability that litigants enjoy: SmartTap has not sufficiently alleged that GlobalTap's complaint is objectively baseless. Count V survives the motion to dismiss: SmartTap sufficiently states a claim for tortious interference and insofar as heightened pleading is required under Rule 9(b), SmartTap pleads those facts with sufficient specificity.

## I.      **Counts I and II: Attempted Monopolization**

In Counts I and II, SmartTap asserts two theories of attempted monopolization: (1) fraudulent procurement of the '348 patent, and (2) bad faith enforcement of that patent.

GlobalTap and Whitman urge that each of these claims is barred by the *Noerr-Pennington* doctrine of immunity. (GlobalTap's Am. Mot. to Dismiss Def. SmartTap's Counterclaims [138], hereinafter "GlobalTap Mot.," 1–3; Am. Third-Party Def.'s Mot. to Dismiss Def. SmartTap LLC's Third-Party Compl. [140], hereinafter "Whitman Mot.," 3, 9.) Under the *Noerr-Pennington* doctrine, "defendants are immune from antitrust liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014); *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56–57 (1993) (citing *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)). That is, citizens who seek redress in courts are generally immune from antitrust liability even when litigation has anticompetitive effects. *See California Motor Transport*, 508 U.S. at 510. Courts have recognized several exceptions to this immunity. A patentee may be stripped of immunity if the patent was obtained through knowing and willful fraud on the Patent Office, known as "*Walker Process*" fraud. *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1068 (Fed. Cir. 1998) (citing *Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.,* 382 U.S. 172, 177 (1965)). Alternatively, immunity is destroyed if a patent enforcement suit is brought in bad faith. *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 994 (9th Cir. 1979). Count I of SmartTap's counterclaim invokes the *Walker Process* exception, alleging fraudulent procurement of a patent, and Count II alleges bad faith enforcement, invoking *Handgards*.

The court need not analyze each exception to *Noerr-Pennington* immunity, however, if Counts I and II do not otherwise satisfy the substantive antitrust pleading requirements. To successfully plead attempted monopolization, SmartTap must allege (1) GlobalTap's specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). In addition to alleging facts that establish the *Walker Process* fraud and the

*Handgards* bad faith enforcement exceptions, SmartTap must adequately plead each of these substantive antitrust elements. *See Walker Process*, 382 U.S. at 177 (to succeed on *Walker Process* claim, pleader must allege an "attempt to monopolize a part of trade or commerce under § 2 of the Sherman Act," by "apprais[ing] the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved."); *Morton Grove Pharm., Inc. v. Par Pharm. Companies, Inc.*, No. 04-cv-7007, 2006 WL 850873, at *9 (N.D. Ill. Mar. 28, 2006) (*Handgards* bad faith enforcement claim must "allege that attempted enforcement of the illegal patents provided economic domination, the power to fix prices, or exclude competitors from the relevant market."); *see also Brunswick Corp. v Riegel Textile Corp.*, 752 F.2d 261, 265 (1984).

SmartTap's allegations do not plausibly establish a dangerous probability of monopolization. To do so, SmartTap would have to identify the relevant market and appraise GlobalTap's exclusionary power within that market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455 (1993) ("A plaintiff alleging actual or attempted monopolization must prove a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power.") (internal quotations omitted); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989) ("Monopoly power has long been defined in the courts as the power to exclude competition or to control price."). For the purposes of the Sherman Act, a market is defined by the reasonable interchangeability of the products and the cross-elasticity of demand for those products. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 394–95 (1956); *Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006).

SmartTap identifies the relevant market as the United States market for outdoor water bottle filling stations (Counterclaim ¶¶ 84–85), but makes only conclusory statements about GlobalTap's exclusionary power within that market. SmartTap alleges that "GlobalTap's conduct has caused demonstrable injury in the form of elimination of competition and reduced consumer choice" (Counterclaim ¶ 89), and that "[t]here is a dangerous probability that

9

GlobalTap's enforcement of the fraudulently procured patent will create market power in the relevant market" (Counterclaim ¶¶ 90, 101), but does not provide any factual allegations to support these conclusions. In its brief, SmartTap suggests that GlobalTap's patent by itself provides support for the allegation that GlobalTap has market power. (Def. SmartTap's Resp. to Am. Mots. to Dismiss its Counterclaim and Third-Party Compl. [153], hereinafter "SmartTap Resp.," 11–12.) But a patent is not, by itself, sufficient to establish monopoly power if the patent does not keep competitors from entering the market. *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45–46 (2006) ("Congress, the antitrust enforcement agencies, and most economists have all reached the conclusion that a patent does not necessarily confer market power upon the patentee. Today, we reach the same conclusion . . . ."); *In re Indep. Serv. Organizations Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000) ("A patent alone does not demonstrate market power."); *see also Ball Memorial Hosp. Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1335–36 (7th Cir. 1986) (large market share does not always reflect power over the prices in a market if there are low barriers to entry). Nowhere does SmartTap make the required allegation that GlobalTap's design patent precludes other manufacturers of outdoor water bottle fillers from entering the market.[7]

SmartTap's only specific allegations relate to the harm that it has suffered itself as a result of this litigation. Thus, SmartTap asserts that "GlobalTap, through Whitman, has already succeeded in eliminating SmartTap as an independent competitor and thereby has monopoly power." (Counterclaim ¶ 91.) SmartTap similarly asserts that it "suffered injury . . . [b]ecause GlobalTap's conduct eliminated SmartTap as an independent rival and artificially restrained U.S. interstate commerce." (Counterclaim ¶ 93; *see also id.* ¶¶ 103, 124.) Though SmartTap alludes

---

[7] The court notes that Elkay—the only other competitor identified by SmartTap—has not been excluded from the market for outdoor bottle fillers. *See* Memorandum Opinion and Order, *GlobalTap v. Elkay Manufacturing*, No. 13-cv-1632 [112]. In fact, in the related case, GlobalTap alleges that Elkay was the first to enter the outdoor bottle filling market, suggesting that Elkay has not suffered any anticompetitive harm based on GlobalTap's '348 patent. *Id.* at 26.

to a restraint on trade and reduced consumer choice, none of SmartTap's factual allegations assert GlobalTap's current possession or potential attainment of monopoly power. SmartTap has not alleged GlobalTap's market share, nor GlobalTap's ability to control prices of outdoor bottle filling stations. Nor has SmartTap asserted that there are any barriers to entry in the bottle filler market. SmartTap contends that "Whitman communicated with and repeated his patent infringement allegations to potential customers of SmartTap . . . with the specific intent to persuade them not to do business with SmartTap" (Counterclaim ¶ 50), but has not alleged that SmartTap's potential customers then did become customers of GlobalTap. In fact, SmartTap explicitly acknowledges that GlobalTap has not produced fountains since 2010, defeating any inference that GlobalTap has any control over the market for these goods, let alone monopoly power. (Counterclaim ¶ 30) ("Whitman admitted that GlobalTap ceased doing business in 2010, and although the LLC was not dissolved, GlobalTap 'wasn't able to do business because it wasn't manufacturing or selling fountains.'") The fact that SmartTap itself has been injured does not satisfy the requirement that SmartTap plead the actual or threatened possession of monopoly power. This conclusion does not change even if the court construes these statements as an assertion that GlobalTap acquired SmartTap's customers by driving SmartTap out of business: "Transfer of business from one company to another . . . without an accompanying effect on competition, cannot be an antitrust violation" because "the antitrust laws. . . were enacted for 'the protection of competition, not competitors.'" *Tri–Gen Inc. v. Int'l Union, Local 150, AFL–CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006). SmartTap has not identified any competitors other than itself, let alone any consumers, that have been harmed by GlobalTap's actions. Even construing the facts in SmartTap's favor, its counterclaim does not include "enough factual matter" to suggest that GlobalTap threatens monopoly power.

The court is cognizant of the Seventh Circuit's warning that questions regarding the requisite market power are typically fact-intensive inquiries best addressed on a motion for summary judgment or at trial. *Endlsey v. City of Chicago,* 230 F.3d 276, 282 (7th Cir. 2000).

Dismissal is nonetheless proper here because SmartTap has failed to identify any facts from which the court can infer that GlobalTap had or threatened sufficient market power to create a monopoly. *See id.* Counts I and II are dismissed without prejudice.

## II. Counts III and IV: Sham Litigation

In Count III, titled "Predatory Sham Litigation," SmartTap asserts that GlobalTap brought objectively baseless litigation with the intention of putting SmartTap out of business. In Count IV, SmartTap alleges that GlobalTap, Whitman, and the Cantwell law firm conspired to monopolize the outdoor water bottle filler market by bringing baseless litigation against SmartTap and Elkay—GlobalTap's competitors—in order to reduce competition in the outdoor bottle filler market. Though a party is generally immune from antitrust liability for litigation activities, a litigant may be stripped of that immunity where the litigation is a sham. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 58 (1993). Litigation is a sham when it is (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" (the objective element), and (2) is motivated by a desire "to interfere directly with the business relationships of a competitor" (the subjective element). *Id.* at 60–61. Though SmartTap's allegations regarding GlobalTap's and Whitman's subjective intent are sufficient,[8] SmartTap has not pleaded facts to support the conclusion that the litigation was objectively baseless. Counts III and IV are, accordingly, dismissed.[9]

---

[8] The Supreme Court has instructed courts not to evaluate the subjective prong of the sham litigation test until after the court concludes that the suit is objectively baseless. *Prof'l Real Estate*, 508 U.S. at 60 ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."). The court's conclusion that the litigation is not objectively baseless precludes an in-depth analysis of GlobalTap's subjective motivations, but the court notes that SmartTap's counterclaim is replete with allegations regarding Whitman's and GlobalTap's intent to put SmartTap out of business.

[9] "Proof of a sham merely deprives the defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his claim." *Prof'l Real Estate Investors,* 508 U.S. at 61. As with Counts I and II, SmartTap must, in addition to alleging circumstances that strip GlobalTap and Whitman of their immunity, also plead the typical antitrust elements: "even a plaintiff who defeats the defendant's claim to *Noerr* immunity by demonstrating both the objective and subjective components of a sham must still prove a

To survive a motion to dismiss, SmartTap must allege facts that show that no reasonable litigant would have expected success at the time the complaint was filed. *Prof'l Real Estate,* 508 U.S. at 61. Courts "must remember that even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing the suit." *Id.* at 61 n.5. It is insufficient to show simply a failed legal theory, or that only some of GlobalTap's claims were objectively baseless. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n,* No. 2013-1112, 2014 WL 7272219, at *6 (Fed. Cir. Dec. 23, 2014) (the focus is "on the act of filing the complaint as the actionable event" and to plead the objective element, a pleader must show that "no reasonable litigant . . . could have expected success on at least one of [plaintiff's] claims.") Accordingly, SmartTap must allege that there was no basis, at the time the complaint was filed, for concluding that *any* theory in GlobalTap's Complaint would survive. SmartTap asserts it has done so for the following reasons: (1) Whitman did not have authority to initiate the lawsuit on behalf of GlobalTap (Counterclaim ¶¶ 15–19, 81–82, 110); (2) GlobalTap and Whitman engaged in delay tactics, in defiance of court orders, to force SmartTap out of business (*id.* ¶¶ 55–80); (3) the patent claims were based on a fraudulent patent (*id.* ¶¶ 38–49, 106–07); and (4) Whitman has admitted that various allegations in the remaining claims of the complaint were false, and several claims against SmartTap, including the patent infringement and breach of contract claims, have been dismissed. (*Id.* ¶¶ 20–25, 35.)

Though the court presumes SmartTap's factual allegations are true, its allegation that GlobalTap's lawsuit was "objectively baseless" at the time of filing is a legal conclusion that is not entitled to this presumption. *See Prof'l Real Estate*, 508 U.S. at 63 ("Where . . . there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law."). Contrary to SmartTap's contention, the bare assertion in the

substantive antitrust violation." *Id.* Count III asserts no substantive violation beyond the sham litigation itself and must also be dismissed for this independent reason.

counterclaim that GlobalTap's complaint was "baseless" is not sufficient. (*See* SmartTap Resp. at 14) (citing Counterclaim ¶ 37.) SmartTap must provide sufficient factual matter to make its conclusions plausible. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The court therefore evaluates SmartTap's four factual allegations to determine if, taking those facts as true, GlobalTap's litigation is objectively baseless.

First, SmartTap asserts that Whitman had no authority to initiate the lawsuit on behalf of GlobalTap, and therefore, had no reasonable basis for expecting success. The court has already considered and rejected this argument, allowing the suit to continue, despite SmartTap's objection. (*See* 4/10/2014 Minute Entry [101]) ("The court is unwilling to dismiss all claims of GlobalTap on the sole basis of misconduct, misrepresentations, or a lack of authority on the part of Mr. Whitman.") Whitman is not a lawyer and appears to have believed he had continuing authority to act on behalf of GlobalTap, effectively a sole proprietorship, despite the bankruptcy. And, when given the opportunity, the Trustee in the bankruptcy did choose to ratify and pursue GlobalTap's claims. Whitman's lack of authority, therefore, did not render GlobalTap's lawsuit objectively baseless. *Cf. Prof'l Real Estate*, 508 U.S. at 60 n.5 ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham.").

Second, SmartTap notes GlobalTap and Whitman's use of delay tactics and their defiance of court orders. But that litigation conduct, however inappropriate, does not demonstrate that no reasonable litigant would have believed that there was a chance GlobalTap's *claim* would be held valid upon adjudication. *See Prof'l Real Estate,* 508 U.S. at 62–63 ("Probable cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that *a claim* may be held valid upon adjudication") (internal quotations and alterations omitted) (emphasis added). Though frustrating and costly to SmartTap, GlobalTap's delay in hiring counsel and in completing the required discovery (*see* Counterclaim ¶¶ 55–82), do not bear on the question of whether the theories advanced in GlobalTap's complaint were likely to succeed on their merits. Furthermore, as noted earlier, the court will not

evaluate whether these actions reflect a subjective intent to interfere with SmartTap's business until SmartTap adequately pleads the objective element. *Prof'l Real Estate*, 508 U.S. at 60; *see also id.* at 63 ("a showing of malice alone will neither entitle the wrongful civil proceedings plaintiff to prevail nor permit the factfinder to infer the absence of probable cause.").

Finally, even accepting the accuracy of SmartTap's remaining allegations—that GlobalTap knew several statements in the second amended complaint, including the validity of its patent and the secrecy of the design, were false—the court concludes that GlobalTap's trade secret claim was not objectively baseless. That other claims against SmartTap have been dismissed (including the breach of contract and patent claims) does not change the outcome. GlobalTap needs only to have had some reasonable belief that one of its claims would succeed. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n,* No. 2013-1112, 2014 WL 7272219, at *6 (Fed. Cir. Dec. 23, 2014). As explained below, SmartTap's allegations do not defeat the objective plausibility of GlobalTap's trade secret misappropriation allegation.

SmartTap insists the trade secret claim is indeed objectively baseless because, according to SmartTap, Whitman and the Trustee for GlobalTap knew that "GlobalTap did not have any trade secrets, and that GlobalTap had not established any trade dress." (Counterclaim ¶ 35.) In support, SmartTap notes, first, that Whitman knew the product design had been released into the public domain in 2009 through the San Francisco launch. (Counterclaim ¶¶ 42–43.) Second, SmartTap highlights Whitman's statements from his bankruptcy deposition that (1) the Business Plan "wasn't really a business plan, it was a concept discussion document in the form of a power point presentation" (Counterclaim ¶ 24; *see also id.* ¶ 25); and (2) GlobalTap did not have any partnerships with Nike, Hurley, or the Rob Machado Foundation's Hydration Nation. (*Id.* ¶ 28.)

But even granting that the design of the bottle filler was public after December 2009, that the Business Plan did not contain any trade secrets, and that those three partnerships did not exist, GlobalTap's second amended complaint contains allegations that could lead a reasonable

litigant to believe a trade secret claim had a chance to succeed. In its second amended complaint, GlobalTap alleges that SmartTap used information in GlobalTap's 25-Page "Program Summary Discussion Document" (2AC ¶ 26); that GlobalTap, through Whitman, shared "sales and pricing information, and financial projections . . . during numerous telephone calls and email communications with Apfelbaum" and other MVG representatives (2AC ¶ 28); and that Apfelbaum, on behalf of SmartTap, used that information to develop business relationships with several cities that were already "working with" GlobalTap including New York City, Boston, San Francisco, Santa Monica, and Philadelphia, as well as private parties with whom GlobalTap had business relationships, including Parsons Brinckerhoff, Elkay Manufacturing, and Most Dependable Fountains. (2AC ¶¶ 31–35, 42, 44.) Sales and pricing information could constitute trade secrets. Indeed, actual and potential client lists are specifically contemplated in the Illinois Trade Secret Act. *See* 765 ILCS 1065/2(d) ("list[s] of actual or potential customers or suppliers" may be trade secrets); *RKI, Inc. v. Grimes,* 177 F.Supp.2d 859, 873 (N.D. Ill. 2001). SmartTap's allegations do not establish that no reasonable litigant could expect success on GlobalTap's trade secret claims against SmartTap. SmartTap's allegations are therefore insufficient to establish the "sham litigation" exception to *Noerr-Pennington* immunity.

## II. Tortious Interference

In Count V, SmartTap asserts GlobalTap and Whitman interfered with its prospective business relations by purposefully communicating the patent infringement allegations—which SmartTap maintains are unfounded—to potential SmartTap customers even after that claim had been dismissed. (Counterclaim ¶¶ 50–54.) GlobalTap and Whitman urge the court to dismiss this claim because it is "nothing more than the mere recitation of the elements" without sufficient factual matter to support the claim.[10] (GlobalTap Mot. at 14.) The court disagrees: SmartTap

---

[10] In their reply briefs, GlobalTap and Whitman assert that Count V must meet the higher pleading standard in Federal Rule of Civil Procedure 9(b). (GlobalTap Reply at 10; Whitman Reply at 10.) Rule 9(b) applies only to allegations of fraud, not to allegations regarding intent, knowledge, or state of mind, which may be averred generally. *Hefferman v.*

has alleged facts which, if true, are sufficient to state a claim for tortious interference with a prospective economic advantage.

To establish such a claim, SmartTap must show: (1) a reasonable expectation of entering into a valid business relationship; (2) GlobalTap and Whitman's knowledge of that expectancy; (3) purposeful interference by GlobalTap and Whitman that prevented SmartTap's legitimate expectancy from ripening into a valid business relationship; and (4) damages resulting from such interference. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484, 693 N.E.2d 358, 370 (Ill. 1998) (quoting *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511, 568 N.E.2d 870, 878 (Ill. 1991)). *See also Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300, 751 N.E.2d 1126, 1133 (Ill. 2001). According to SmartTap, it had a reasonable expectation of entering into business relationships with certain customers; and GlobalTap and Whitman knew about those relationships and purposefully repeated patent infringement allegations, which GlobalTap and Whitman knew to be unfounded, to those customers. In some instances, Whitman "gave potential customers of SmartTap a copy of the Complaint alleging infringement of the '348 patent and other counts that have been dismissed" with the specific intent to exclude SmartTap from the outdoor bottle filling station market. (Counterclaim ¶¶ 53–54.) As a result of those communications, SmartTap lost customers and eventually went out of business. (Counterclaim ¶¶ 129–130.) These allegations are sufficient to state a claim for tortious interference with prospective economic advantage. The motions to dismiss are denied with respect to Count V.

---

*Bass*, 467 F.3d 596, 601 (7th Cir. 2006). SmartTap is not required to plead with particularity Whitman's intent to interfere with its business or his knowledge of SmartTap's expectancy of customer relationships. Insofar as Count V incorporates SmartTap's allegations of Whitman and GlobalTap's fraud on the Patent and Trademark Office, those allegations must meet Rule 9(b)'s heightened standards. Rule 9(b) requires the pleader to allege the who, what, where, when, and how of the fraud. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014). SmartTap has alleged that GlobalTap, through Whitman, (who), failed to disclose prior art, Elkay's partial ownership, and information obtained from Elkay (what), in the patent prosecution (where), which the PTO relied on in issuing the patent in 2011 (when). Those allegations, accordingly, satisfy Rule 9(b)'s heightened requirement.

## III.     Piercing the Corporate Veil

Finally, Whitman urges that the third-party complaint against him should be dismissed because SmartTap has not pleaded facts that support piercing the corporate veil.     (Whitman Mot. at 14.)   Whitman urges that he is shielded by the Michigan statute, which states that "[u]nless otherwise provided by law or in an operating agreement, a person that is a member or manager, or both, of a limited liability company is not liable for the acts, debts, or obligations of the limited liability company."  (Whitman Reply at 11) (citing MICH. COMP. LAWS § 450.4501(4).) SmartTap does not contest that Michigan law governs veil-piercing in this case.  (*See* SmartTap Resp. at 20.)[11]  Under Michigan law, piercing the corporate veil is a fact-specific question:

> For the corporate veil to be pierced, the corporate entity must be a mere instrumentality of another individual or entity. Further, the corporate entity must have been used to commit a wrong or fraud. Additionally, and finally, there must have been an unjust injury or loss to the plaintiff. There is no single rule delineating when a corporate entity should be disregarded, and the facts are to be assessed in light of a corporation's economic justification to determine if the corporate form has been abused.

*RDM Holdings, LTD v. Cont'l Plastics Co.*, 281 Mich. App. 678, 715, 762 N.W.2d 529, 550–51 (Mich. App. Ct. 2008); *see also Florence Cement Co. v. Vettraino*, 292 Mich. App. 461, 469, 807 N.W.2d 917, 922 (Mich. App. Ct. 2011) ("[t]here is no single rule delineating when the corporate entity may be disregarded[,] . . . [t]he entire spectrum of relevant fact forms the background for such an inquiry, and the facts are to be assessed in light of the corporation's economic

---

[11]     Instead, SmartTap urges that, under Michigan law, Whitman is not entitled to protection of the corporate veil.  First, SmartTap contends that a Michigan statute prohibits Whitman from being both an employee and a member of GlobalTap at the same time. (SmartTap Resp. at 20) (citing MICH. COMP. LAWS §§ 450.4102(2)(p), 450.4501 *et seq.*)  The court finds no such restriction in the statutory language.   Second, SmartTap asserts that as a result of Mr. Whitman's voluntary bankruptcy petition, he was divested of his interest and control in GlobalTap, so that he was no longer entitled to the protection of the corporate veil. (SmartTap Resp. at 20–21.)   SmartTap has cited no cases that support its assertion that a voluntary bankruptcy petition *automatically* limits the applicability of the corporate veil.     As explained in the text, even if Whitman is entitled to assert the protection of the corporate veil, SmartTap has sufficiently pleaded facts that support disregarding the corporate entity, and the court need not resolve whether Mr. Whitman's personal bankruptcy automatically extinguished his status as a member of GlobalTap.

justification to determine if the corporate form has been abused.") (alterations in original). The Supreme Court has adopted a similar test as a matter of federal common law: "the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when . . . the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *United States v. Bestfoods*, 524 U.S. 51, 62 (1998).

The fact-specific nature of this inquiry renders a motion to dismiss under 12(b)(6) inappropriate at this stage. First, to the extent that SmartTap has alleged that Whitman himself engaged in tortious interference, his conduct would not be protected by the corporate veil. (Counterclaim ¶ 50) ("After filing this suit, Whitman communicated with and repeated his patent infringement allegations to potential customers of SmartTap . . . with the specific intent to persuade them not to do business with SmartTap.") Whitman may establish later that those actions were taken on behalf of GlobalTap, but SmartTap's allegations of individual conduct are sufficient to survive a motion to dismiss. At issue in a 12(b)(6) motion is "not whether a plaintiff will ultimately prevail" but whether the party is entitled to offer evidence to support the claims alleged. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011) (internal quotation and citation omitted).

Moreover, insofar as Whitman did act on behalf of GlobalTap, the court is satisfied that SmartTap's factual allegations are sufficient to infer a unity of interest that justifies piercing the corporate veil: According to SmartTap, Mr. Whitman has consistently, throughout this litigation, asserted his authority to direct GlobalTap in his own interests, despite the fact that he filed a bankruptcy petition and the Trustee in that bankruptcy proceeding is the true owner of GlobalTap. (Counterclaim ¶¶ 13–14.) Notably, Whitman's own conduct in this litigation—filing the lawsuit on his own while his bankruptcy was pending, and representing himself as "the plaintiff" to the court (*see* Counterclaim ¶ 57)—suggests a unity of interest and an attempt to use the corporate entity as an alter ego. The allegations of Mr. Whitman's tortious interference

with SmartTap's business are sufficient to allege a wrong or fraud that justifies piercing the veil. SmartTap may, accordingly, proceed against Mr. Whitman individually.

## CONCLUSION

SmartTap's allegations do not support the inference that there is a dangerous probability that GlobalTap would acquire monopoly power. Nor do its allegations suggest that GlobalTap's complaint is objectively baseless. SmartTap has adequately pleaded tortious interference and Whitman is not entitled to assert the protection of the corporate veil at this stage. GlobalTap's motion to dismiss SmartTap's counterclaim [138] and Mr. Whitman's motion to dismiss SmartTap's third party complaint [140] are accordingly granted with respect to Counts I, II, III, and IV and denied with respect to Count V. Counter-Defendants Whitman and GlobalTap are directed to answer that Count within 14 days.

ENTER:

Dated: February 24, 2015

REBECCA R. PALLMEYER
United States District Judge